IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

FRANCISCO R. GARCIA,                    )
                                        )
            Plaintiff,                  )
                                        )
                                        )    CIV-11-1206-F
v.                                      )
                                        )
MICHAEL J. ASTRUE,                      )
  Commissioner of Social Security       )
  Administration,                       )
                                        )
            Defendant.                  )

REPORT AND RECOMMENDATION

Plaintiff Francisco R. "Frank" Garcia seeks judicial review pursuant to 42 U.S.C.

§405(g) of the final decision of Defendant Commissioner denying his concurrent applications

for disability insurance and supplemental security income benefits under Title II and Title

XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1382.  Defendant has answered the

Complaint and filed the administrative record (hereinafter TR___), and the parties have

briefed the issues.   The matter has been referred to the undersigned Magistrate Judge for

initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B).   For the following reasons, it

is recommended that the Commissioner's decision be affirmed.

I. Background

On October 27, 2008, Plaintiff protectively filed his applications for disability

benefits. (TR 148-154, 155-157, 171).  At that time, Plaintiff was 35 years old, and he

alleged that he was disabled beginning October 4, 2008, due to depression, anxiety, kidney stones, chronic back pain, and acid reflux. (TR 148, 155, 176).   Plaintiff stated that he had chronic back, leg, and foot pain due to an on-the-job lower back injury and a Tarlov cyst.[1] (TR 193).  Plaintiff's applications were denied initially and on reconsideration. (TR 83-86).

At Plaintiff's request, a hearing *de novo* was conducted before Administrative Law Judge Thompson ("ALJ") on February 5, 2010, at which Plaintiff appeared telephonically[2] and with a representative. (TR 28-82).   Plaintiff's wife and a vocational expert ("VE") also testified at the hearing.   The ALJ issued a decision on April 30, 2010, in which the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (TR 14-24).  The Appeals Council declined to review this decision. (TR 6-9).

II. Standard of Review

Plaintiff now seeks judicial review of the final decision of the Defendant Commissioner embodied in the ALJ's determination.  Judicial review of a decision by the Commissioner is limited to a determination of whether the Commissioner's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.  Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003).  The "determination of whether the ALJ's ruling is

_____

[1]"Tarlov cysts are fluid-filled sacs that most often affect nerve roots at the lower end of the spine (sacrum).  Such cysts typically cause no symptoms and are found incidentally on magnetic resonance imaging (MRI) studies done for other reasons." http://www.mayoclinic.com/health/ tarlov-cysts/AN01603.

[2]The transcript of the hearing reflects that Petitioner was in custody at the time of the hearing in the Beckham County Jail. (TR 30).

supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009)(citations, internal quotation marks, and brackets omitted).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i).  The Commissioner follows a five-step sequential evaluation procedure to determine whether a claimant is disabled. Doyal, 331 F.3d at 760. In the first four steps of this process, the claimant has the burden of establishing a prima facie case of disability. Id.  In this case, Plaintiff's claim was denied at step five.  At the fifth and final step of the requisite sequential evaluation process, the burden shifts to the Commissioner "to show that the claimant retains sufficient [residual functional capacity] . . . to perform work in the national economy, given her age, education and work experience." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007)(internal quotation and citation omitted).

III. Eligibility for Benefits

Preliminarily, the issue of Plaintiff's eligibility for benefits must be addressed. Plaintiff testified at the hearing that he had been detained in a county jail on criminal charges beginning in "September" but he was unsure of the exact date his detention began. (TR 34). Plaintiff's wife testified at the hearing that the couple's two children were then in the custody

of the Oklahoma Department of Human Services, that Plaintiff had been charged with multiple counts of Rape in the First Degree and Lewd Molestation involving his minor daughter, and that Plaintiff had not yet been convicted of those charges although he had entered into a plea agreement. (TR 54).  Plaintiff's wife testified that at the time of the hearing their daughter was ten years old and that Plaintiff's offenses involving their daughter occurred when the daughter was "seven and maybe possibly nine" years old. (TR 61).

Public records of the Oklahoma Department of Corrections ("ODOC") reflect that on March 17, 2010, Plaintiff was convicted of five counts of Lewd Molestation and two counts of Rape in the First Degree, and for these convictions Plaintiff is incarcerated serving concurrent 13-year terms of imprisonment followed by concurrent 12-year terms of supervised release.  http://www.doc.state.ok.us/offenders/ (last accessed August 23, 2012).

Nowhere in Plaintiff's briefing does Plaintiff inform the Court of Plaintiff's convictions or incarceration.  At the time of Plaintiff's incarceration in March 2010, the Social Security Act provided, subject to an exception not relevant here, that "no monthly [disability] benefits shall be paid [under Title II of the Social Security Act] . . . to any individual for any month . . . such individual is confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of a criminal offense . . . ." 42 U.S.C. § 402(x)(1)(A)(i).  See 20 C.F.R. § 404.468(a).  Pursuant to 42 U.S.C. §1382(e)(1)(A)(effective January 1, 1974), with an exception not relevant here, "no person shall be an eligible individual . . . for [Title XVI benefits] with respect to any month if throughout such month he is an inmate of a public institution." See 20 C.F.R. §§ 404.468;

4

416.968 (prisoners confined to a jail, prison, or other penal institution for a felony conviction are not eligible for social security disability benefits).

While the fact of Plaintiff's incarceration had nothing to do with his disability, this fact is certainly relevant to Plaintiff's eligibility for benefits.  In light of the fact that his convictions and incarceration preceded the date of the ALJ's decision, Plaintiff, and his attorney as an officer of the Court, should have informed the Court of his noneligibility for benefits beginning March 17, 2010.  As a result of his convictions and incarceration, Plaintiff must demonstrate he was disabled before March 17, 2010, with respect to both of his applications for benefits.[3]

IV. ALJ's Determination

Following the requisite sequential evaluation procedure, the ALJ found at step one that Plaintiff had not worked since October 14, 2008, the date he allegedly became disabled. (TR 16).  At step two, the ALJ found that Plaintiff had severe impairments due to "degenerative disc disease of the lumbar spine with Tarlov cyst, status post decompression surgery; history of kidney stones and right ureterectasis, status post dilation of the ureteral

_____

[3]With respect to Plaintiff's application for Title XVI supplemental security income ("SSI") benefits, Congress did not define "public institution" in the law excluding from SSI eligibility anyone who is an "inmate of a public institution."  Exercising the discretion granted the agency to interpret this term, the Commissioner has determined that a public institution includes an institution that is "operated by or controlled by . . . a State, or a political subdivision of a State such as a city or county." 20 C.F.R. § 416.201.  While it is clear Plaintiff was in the custody of a county jail, which the agency has determined constitutes a public institution, as a pretrial detainee prior to his convictions, there is insufficient evidence in the record from which to determine the time during which Plaintiff was confined to the county jail prior to his convictions.  Thus, as a result of this uncertainty in the record, the undersigned finds that Plaintiff's eligibility for benefits ended on the date of his convictions.

5

stricture and stent placement; chronic gastritis; obesity; depression; rule-out personality

disorder [not otherwise specified] with borderline features." (TR 16).

At step three, the ALJ found that the medical evidence did not reflect an impairment

or combination of impairments that satisfied or medically equaled an impairment deemed *per*

*se* disabling under the agency's Listing of Impairments. (TR 17-19).  At the fourth step, the

ALJ reviewed the medical and nonmedical record and determined that Plaintiff's

impairments did not preclude him from performing work at the light exertional level

"restricted to the following: the claimant is able to perform simple, repetitive tasks only; can

relate on a superficial basis; and his adaptive functions are intact." (TR 19-22).

In consideration of Plaintiff's description of his past relevant work as a retail manager,

customer service manager, and grocery stocker and the VE's testimony regarding the mental

and physical demands of these jobs, the ALJ found that Plaintiff's residual functional

capacity ("RFC") for work precluded the performance of his previous jobs.  At the fifth and

final step, the ALJ found that in light of Plaintiff's RFC for work and his vocational

characteristics, including his age, education, and work experience, he could perform jobs

available in the economy, such as packing line worker, small products assembler II, and

motel cleaner. (TR 22-23).  Consequently, the ALJ denied Plaintiff's applications for benefits

as he was not disabled within the meaning of the Social Security Act on or before the date

of the decision.

V. Medical Record Concerning Physical Impairments

The medical record reflects that Plaintiff was examined by a neurosurgeon, Dr.

Horton, in December 2005.  Plaintiff complained that in September 2005 he had slipped on water and fallen, landing on his back, at his job replacing tires. (TR 259-260, repeated at 268-269).  Dr. Horton noted that lumbar MRI testing suggested "a Tarlov's cyst at the right L5-S1 level which is most likely a congenital abnormality.  There is no evidence of other thecal sac or nerve root compression in my opinion." (TR 260, 269).  Dr. Horton's diagnostic impression was right sacroiliitis subsequent to Plaintiff's work-related fall. (TR 260, 269).  Dr. Horton recommended that Plaintiff could work with a 20-pound weight lifting restriction with no repetitive bending or lifting and referred Plaintiff to a "physiatrist." (TR 260, 269).

In January 2006, Plaintiff was examined by Dr. Brown, a neurosurgeon, who noted Plaintiff complained of back pain radiating down the right leg and foot after a work-related fall. (TR 280-281).  Dr. Brown noted Plaintiff had been treated conservatively following the injury with muscle relaxant and pain medications, that no surgical intervention was recommended, and that MRI testing of Plaintiff's lumbar spine was normal with the exception of a Tarlov cyst in the upper sacral canal. (TR 280-281).  Dr. Brown placed a "light" work limitation on Plaintiff with no lifting or carrying of greater than 20 pounds. (TR 281).  In February 2006, Dr. Brown noted that he recommended Plaintiff begin a physical therapy program and that Plaintiff was capable of performing "light duty" work with no lifting or carrying of greater than 20 pounds. (TR 640).  A physical examination of Plaintiff was noted to be essentially normal except for mild tenderness to palpation of the right sacroiliac region. (TR 640).

In January 2007, Plaintiff's treating family osteopathic physician, Dr. Robison,

referred him to Dr. Remondino, a neurosurgeon, for evaluation of continuing back and right leg pain. (TR 322).  Plaintiff indicated he was a cashier and had problems with the standing requirements of the job due to back and leg pain, although he noted improvement of the pain with sitting or lying down. (TR 322).  Following MRI testing of Plaintiff's lumbar spine, Dr. Remondino noted a diagnostic impression of "[s]ynovial cyst versus Tarlov's cyst on the right at L5-S1" and "[r]ight S1 radiculopathy" due to the cyst.  (TR 323).  Further testing was recommended to determine the type of cyst, and the physician recommended surgical decompression and removal of the cyst. (TR 323).  Dr. Remondino noted that Plaintiff's pain symptoms were more consistent with a synovial cyst because "Tarlov's cysts usually are not painful or compressive in etiology." (TR 323).

Plaintiff underwent a spinal decompression operation performed by Dr. Remondino in February 2007 and was released in good condition two days later. (TR 300, 302-303). One week later, Dr. Remondino noted Plaintiff returned for follow-up treatment for "status post right L5-S1 decompression," that Plaintiff had a "Tarlov's cyst and not a synovial cyst" and that he was "doing better with less leg pain." (TR 320).  In June 2007, Dr. Remondino reported to Dr. Robison that Plaintiff was still experiencing pain with standing or walking and pain in his right lateral thigh and calf but that his gait was normal and his strength was good. (TR 318).  Dr. Remondino recommended a trial of Neurontin®, a nerve pain medication, and that Dr. Robison continue the previously-prescribed narcotic pain medication, although he noted the narcotic pain medication could possibly be reduced or eliminated. (TR 318).   In November 2007, MRI testing of Plaintiff's lumbar spine was

interpreted as showing spinal stenosis at L5-S1 level and a synovial cyst below the L5-S1 level with effacement of the nerve root. (TR 521).

In March 2008, April 2008, May 2008, June 2008, July 2008, August 2008, September 2008, November 2008, December 2008, January 2009, February 2009, and March 2009, Plaintiff sought treatment at Dr. Robison's clinic generally for refills of his medications, and a registered nurse practitioner in the clinic noted that Plaintiff's medications were controlling his pain. (TR 465-467, 473-475, 476-477, 479-480, 484-485, 486-487, 488-489, 490-491, 600-602, 603-605, 606-608, 609-610).

In January 2009, Plaintiff underwent a physical consultative examination conducted by Dr. Long. Plaintiff reported that he was primarily depressed and that he had back pain radiating into his legs and feet and persistent kidney stones for which he was being treated by a urologist. (TR 530). Plaintiff also reported he was "suicidal with at least three suicide attempts with knife and gun." (TR 530). Plaintiff reported he occasionally worked at Wal-Mart and that he had a congenital Tarlov cyst on his spine. (TR 530). Dr. Long noted that Plaintiff walked slowly and deliberately but with "good stability and safety" and that he seemed to have "real suicidal tendencies." (TR 530-532). Range of motion testing was noted to be largely normal with some decreased movement in neck extension, left hip flexion, lumbar spine extension, and left shoulder movement. (TR 533-536). Dr. Long noted that no pain was elicited with lumbar spine motion testing. (TR 535).

In April 2009, Dr. Robison noted that Plaintiff complained of severe pain which interfered with his daily activities and work. (TR 595). Although no abnormal findings were

noted in a musculoskeletal examination, Dr. Robison prescribed a narcotic medication for Plaintiff's degenerative disc disease. (TR 599). Dr. Robison noted in May 2009 that Plaintiff exhibited a "reduced" range of motion with radiating pain, and the pain medication was continued. (TR 592-594).

In June 2009, Dr. Robison noted Plaintiff was in a "pain management program" at his clinic, that Plaintiff's symptoms were "moderate," and that medications were prescribed. (TR 650-652). Later in June 2009, Dr. Robison noted Plaintiff's pain symptoms were improving with Lyrica®, a medication used to relieve neuropathic pain,[4] and were "well controlled on the treatment." (TR 652). In July 2009 and in August 2009, Dr. Robison again noted that Plaintiff's pain symptoms were well controlled on the prescribed medications. (TR 653-655). There are no further notes of treatment of Plaintiff by Dr. Robison.

In April 2007, Dr. Coker noted that Plaintiff complained of intermittent "pain with hematuria" and that CT scan testing of Plaintiff's abdomen revealed three small kidney stones and right-sided ureterectasis (distention of the ureter). (TR 391-392). Plaintiff underwent surgery in April 2007 performed by Dr. Coker to successfully open a ureteral stricture. (TR 386-387). Two days later, Plaintiff underwent a second surgical procedure, and a stent was placed to repair the ureteral obstruction. (TR 332). Plaintiff did well following the operation and was discharged two days later. (TR 332). In May 2007, the stent was removed. (TR 330, 412-413).

---

[4]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000327/.

In May 2008, Plaintiff underwent an emergency appendectomy for acute appendicitis. (TR 361-362).  In September 2008, Plaintiff sought treatment at a hospital emergency room for abdominal pain and nausea which he stated had occurred for the previous month. (TR 446-448).  CT scan testing of Plaintiff's abdomen did not show a medical impairment.  The examining physician recommended over-the-counter medication for Plaintiff's abdominal discomfort. (TR 448).   In September 2008, Plaintiff saw Dr. Robison for abdominal complaints, and Dr. Robison noted CT scan testing was normal and anti-nausea medication was prescribed. (TR 470-472).

In October 2008, Plaintiff was examined by Dr. Glasgow, a urologist, for intermittent nausea and right-sided abdominal pain. (TR 367).   Dr. Glasgow performed an esophagogastroduodenoscopy ("EGD") with biopsy, which was interpreted as showing "multiple small ulcerations . . . in the stomach but no active bleeding" and "mild duodenitis" (inflammation of the duodenum). (TR 369).   In October 2008, a stomach biopsy was interpreted as showing moderate chronic gastritis. (TR 370).

In May 2009, CT scan testing of Plaintiff's abdomen was interpreted as showing "probable distal ureteral stenosis without obstruction" and "non-obstructing nephrolithiasis" (small kidney stones). (TR 648).  This record does not indicate that any treatment was recommended to Plaintiff following the October 2008 or May 2009 testing.

The record also contains a physical RFC assessment completed by a state agency consultative physician, Dr. Aber, in March 2009. (TR 565-572).  In this assessment, Dr. Aber opined that Plaintiff was capable of performing the full range of work at the light exertional

level.

VI. Medical Record Concerning Mental Impairments

In September 2007, Plaintiff complained to Dr. Robison of chronic anxiety and panic attacks. (TR 502).  Dr. Robison noted that in a psychiatric evaluation Plaintiff showed no evidence of depression, excessive anxiety, or agitation, intact memory, and normal attention and concentration. (TR 503).  The diagnostic impression was anxiety, unspecified, for which medication was prescribed.  (TR 503-504).

Dr. Robison noted in November 2007 that Plaintiff again showed no evidence of depression, excessive anxiety, or agitation. (TR 499-500).  The diagnostic impression included anxiety, unspecified, and neurotic depression, for which anti-anxiety and antidepressant medications were prescribed. (TR 500-501).  Dr. Robison continued to prescribe anti-anxiety and antidepressant medications for Plaintiff in December 2007 and in February 2008, although the physician noted that psychiatric evaluations showed no evidence of depression, excessive anxiety, or agitation, no memory deficits, no concentration deficits, and no thought or speech impairment. (TR 493-495, 496-498).

Anti-anxiety medication was prescribed for Plaintiff by Dr. Robison's clinic in March 2008 to June 2008. (TR 484-485, 486-487, 488-489, 490-491).  In October 2008, a registered nurse practitioner ("RNP") at Dr. Robison's clinic noted Plaintiff was examined and that anti-depressant medication was prescribed for depressive disorder. (TR 468-469).

In November 2008, Dr. Robison completed a mental functional assessment questionnaire in which the physician opined that Plaintiff did not have a mental condition

that imposed more than minimal limitations. (TR 464).   Antidepressant medication was prescribed for Plaintiff by an examining RNP in January 2009, February 2009, and March 2009. (TR 600-602, 603, 608).   The RNP noted a diagnostic impression of depressive disorder.   However, in April 2009, Dr. Robison noted that Plaintiff showed no evidence of depression, excessive anxiety, or agitation, and he exhibited no abnormal thought processes, no memory deficit, and no attention or concentration deficit. (TR 597).

In February 2009, Plaintiff sought treatment at a mental health clinic. (TR 583).   The report of the initial assessment indicates Plaintiff reported depression beginning with his on-the-job injury 5 years previously, problems sleeping, mood swings, anger, anxiety, memory problems, and frequent suicidal thoughts. (TR 583).   Plaintiff reported he had not previously sought mental health treatment. (TR 584).   Plaintiff was prescribed anti-depressant and anti-anxiety medications at the clinic in March, April, May, and June of 2009. (TR 577).   His treating psychiatrist at the clinic, Dr. Ahn, noted in March 2009, April 2009, May 2009, and June 2009, that Plaintiff exhibited a depressed and/or anxious mood. (TR 573-576).

In March 2009, Plaintiff underwent a mental status examination conducted by Dr. Danaher, a clinical psychologist, for the agency.   According to Dr. Danaher's report of the consultative examination, Plaintiff described depressive symptoms beginning after he injured his back three years previously and associated with back, right leg, and right foot pain.   Dr. Danaher noted that Plaintiff's affect was congruent, his speech was logical, goal directed, and fully intelligible, Plaintiff was alert and oriented, and his memory was intact.   The diagnostic impression, which Dr. Danaher noted was based on his clinical observation and on Plaintiff's

13

reported history and symptoms, was major depressive disorder, recurrent, moderate severity and possible personality disorder not otherwise specified with borderline features. (TR 544). Dr. Danaher opined that Plaintiff had a "fair" ability to understand, remember, and carry out simple and complex instructions in a work environment. (TR 545).

In June 2009, Plaintiff was treated at a hospital for a suicidal attempt after taking an overdose of his pain and antidepressant medications. (TR 642, 645).  He indicated he had been served with a protective order filed by his wife, and an issue of "child abuse" was also noted by the attending physician. (TR 645).  Plaintiff was diagnosed with depressive disorder not otherwise specified. (TR 664).  Plaintiff was "doing much better" and was transferred to his treating mental health clinic the following day. (TR 642-643).  Plaintiff was discharged seven days later on antidepressant and anti-anxiety medications. (TR 677).

In August 2009, Plaintiff informed his treating mental health clinic providers that he was being investigated for abusing his daughter. (TR 660-662).  Dr. Ahn noted Plaintiff was depressed and anxious and was not compliant with his medications in September 2009. (TR 659).  Dr. Ahn noted in November 2009 that Plaintiff reported he had been detained in jail for about a month on charges of rape and that he had not been compliant with his medications. (TR 658).  In January 2010, Dr. Ahn again noted that Plaintiff had not been compliant with his medications and that he appeared anxious. (TR 657).

The record also contains a mental RFC assessment and psychiatric review technique form completed by Dr. Kampschaefer in March 2009. (TR 547-564).  Dr. Kampschaefer opined that Plaintiff was capable of performing simple, repetitive tasks and can relate on a

superficial basis. (TR 563).

VII. RFC and Credibility Findings

In his opening and reply briefs, Plaintiff contends, first, that the ALJ did not provide a sufficient explanation for his RFC finding for light work. Secondly, Plaintiff contends that the ALJ failed to properly assess the functional limitations resulting from Plaintiff's physical and mental impairments. Finally, Plaintiff contends the ALJ erred in assessing Plaintiff's credibility. Defendant responds that no error occurred in the ALJ's evaluation of the evidence and that substantial evidence supports the Commissioner's decision.

Plaintiff points to the report of the consultative examiner, Dr. Long, in which Dr. Long noted that Plaintiff's "gait [was] slow but with good stability and safety." (TR 531). The ALJ referred to Dr. Long's finding of a "stable and safe gait" as reasons supporting the RFC assessment for light work. (TR 20). Plaintiff argues that the ALJ failed to discuss whether Plaintiff's "slow" gait reportedly observed by Dr. Long would be consistent with the standing and walking requirements of light work. However, there is no other medical evidence in the record that Plaintiff exhibited a "slow" gait, and the ALJ's decision reflects consideration of Dr. Long's report. Plaintiff's mere suggestion that a "slow" gait might adversely affect his ability to perform the standing and walking requirements of light work is not supported by any authority. As the ALJ reasoned, Plaintiff was able to work following his back and kidney surgeries, and that his work history suggested that his symptoms would not preclude him from working again. (TR 21). The ALJ also pointed to objective medical evidence in the record that Plaintiff exhibited normal coordination. (TR 20, 598). The

isolated finding in the consultative examiner's report that Plaintiff walked with a "slow" but steady and safe gait is not inconsistent with the ALJ's RFC finding for light work.

In the ALJ's decision, the ALJ's step four reasoning includes specific references to the medical record and Plaintiff's statements to medical professionals and at the hearing.  The ALJ recognized that in the consultative physical examination conducted by Dr. Long and in the report of Dr. Robison of a physical examination of Plaintiff conducted in April 2009 Plaintiff exhibited a stable and safe gait, no tenderness in his spine or abdomen, normal reflexes, intact sensation, and normal coordination and fine motor skills. (TR 20).  (See TR 530-535, 595-599).  The ALJ also noted that testing during Plaintiff's back operation showed "no electrodiagnostic evidence of spinal cord, nerve root, lumbosacral plexus or peripheral nerve injury." (TR 20). (See TR 324).  Further, the ALJ noted that the record showed Plaintiff's physical symptoms had "improved with treatment." The ALJ cited to treatment records in March 2009 and June 2009, both indicating Plaintiff's medications were controlling his pain. (TR 20). (See TR 652, 654). Finally, the ALJ noted that the medical record did not reflect that Plaintiff sought treatment from neurological or orthopedic specialists after June 2009 or that Plaintiff sought follow-up care with a urological specialist between June 2007 and April 2009. (TR 20).

An ALJ is not required to discuss every piece of evidence in the administrative record, but "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996).  The ALJ

discussed the relevant evidence in the medical record and provided legitimate reasons which are well supported by the record for finding Plaintiff's complaints of severe physical and mental limitations were not entirely credible.   Although Plaintiff argues that the ALJ failed to question Plaintiff in certain instances, Plaintiff was represented at the hearing and provided testimony concerning his symptoms, medical treatment, and work history.  No error occurred with respect to the ALJ's development of the record in this matter.

As the ALJ stated, the record reflects that Plaintiff pain symptoms improved with medication, that Plaintiff did not seek mental health treatment until February 2009, that Plaintiff was able to work following his back and kidney operations, and that no treating or examining physician indicated Plaintiff was disabled or had limitations greater than those found by the ALJ.  The ALJ provided other reasons for the RFC finding, including the RFC assessments by the agency's consultative physicians and the physical and mental status examination findings by Plaintiff's treating providers.

Contrary to Plaintiff's argument, the ALJ's RFC finding is not inconsistent with the clinical findings noted by Dr. Remondino concerning his physical examination of Plaintiff in February 2007, as that examination preceded Plaintiff's 2007 spinal decompression surgery. (TR 307).  Plaintiff also points to one note in a report by Dr. Glasgow in May 2008 made in connection with Plaintiff's admission to a hospital for acute appendicitis.  In this report, Dr. Glasgow notes that Plaintiff gave a history that his back pain was "poorly controlled" with narcotic pain medications. (TR 361).  Of course, this is not a medical assessment by Dr. Glasgow but a subjective statement by the Plaintiff.  Dr. Glasgow did not

17

treat Plaintiff for his back injury or for pain related to his back injury, and this notation is not a "contradictory medical record," as suggested by Plaintiff.

Although Plaintiff argues that the ALJ failed to consider his statements that he had required the placement of a "stimulator" in his back in April 2009 (TR 223) and that he began using a TENS unit in May 2009 (TR 236), there is no medical record of these treatment measures being prescribed for Plaintiff.   Thus, there is no probative medical evidence to support Plaintiff's subjective statements.

There is substantial evidence in the record, as noted by the ALJ, including the treatment notes of Dr. Robison showing Plaintiff's pain symptoms improved and were "controlled" with medications and the absence of evidence of follow-up treatment after May 2007 by a specialist for kidney-related problems, to support the ALJ's RFC finding that Plaintiff could perform light work.

Plaintiff points to MRI testing of Plaintiff's lumbar spine conducted in October 2006 which was interpreted as showing a synovial cyst effacing the  nerve root at one level in Plaintiff's spine. (TR 327).   However, this test result preceded Plaintiff's spinal decompression surgery and does not detract from the ALJ's RFC assessment.

Plaintiff contends that the ALJ did not consider probative evidence of adverse medication side effects.  Plaintiff testified that before he was detained in jail he "couldn't think right" due to his medications and that his medications made him drowsy. (TR 36, 41). Plaintiff also points to a notation in the record made by the consultative examiner that Plaintiff appeared to be "mild[ly]-to-moderately obtunded possibly from the medications [or]

possibly from his mental problems." (TR 532). However, the ALJ recognized in the decision that Plaintiff reported he had no energy, felt tired all of the time, and was very limited in his ability to concentrate. (TR 20). The ALJ provided reasons for discounting these subjective statements by pointing to medical evidence in the record, including clinical findings in mental status examinations conducted at Plaintiff's treating medical clinic. (TR 20). Plaintiff's records of mental health treatment do not reflect any reports of adverse side effects. (TR 657-659, 663, 680-681). The ALJ was not required to address every piece of medical evidence in the record, and he did not err by failing to address the isolated comment suggesting that Plaintiff appeared to have a dull affect during the consultative physical examination in the absence of other evidence of adverse medication side effects in the record.

Plaintiff continues to point to his own subjective statements in support of his argument that the ALJ's RFC assessment should have included "limitations, such as work absences or unscheduled extra restroom breaks" related to Plaintiff "stomach and urinary conditions that he found 'severe.'" Plaintiff's Opening Brief, at 8-9. The ALJ's decision reflects consideration of Plaintiff's subjective statements as well as the relevant medical evidence in connection with Plaintiff's severe impairments. As the ALJ reasoned, the record does not reflect that any treating medical provider placed limitations on Plaintiff's ability to work as a result of his severe physical or mental impairments or that Plaintiff sought "follow-up specialist care for kidney problems" following the removal of the ureteral stent in May 2007. (TR 20). Plaintiff points to a CT scan conducted in May 2009 which showed evidence of "non-obstructing nephrolithiasis" (kidney stones). (TR 625). However, as the ALJ reasoned,

there was no record that Plaintiff received medical treatment for a kidney impairment following this test.

Although Plaintiff refers to a diagnostic impression of "proctitis"[5] (without benefit of a page reference), Plaintiff fails to indicate how this diagnostic impression detracts from the RFC assessment made by the ALJ or how the diagnostic impression is related to the severe impairments found by the ALJ.   The ALJ did not err in failing to include additional functional limitations in the RFC findings as suggested by Plaintiff.

Plaintiff contends that the ALJ erred in failing to consider evidence in the record reflecting that Plaintiff had an impairment due to anxiety disorder.  Dr. Robison noted in his treatment records of Plaintiff in September 2007, November 2007, and  February 2008, a diagnostic impression of "anxiety state, unspecified AD" for which anti-anxiety medication was prescribed. (TR 493-495, 500-501, 502-504).  However, Dr. Robison also noted that psychiatric evaluations of Plaintiff in December 2007 and in February 2008 showed no evidence of depression, excessive anxiety, or agitation, no memory deficits, no concentration deficits, and no thought or speech impairment. (TR 493-495, 496-498).

In November 2008, Dr. Robison completed a form in which the physician stated that Plaintiff's unspecified "mental condition" did not impose more than minimal limitations. (TR 464).  The ALJ's decision reflects consideration of this relevant medical evidence.  The ALJ's decision reflects that the ALJ considered the objective clinical findings by Dr. Robison

---

[5] Proctitis is defined as an inflammation of the rectum. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002124/.

in mental status examinations of Plaintiff and Dr. Robison's November 2008 opinion. (TR 18, 20, 21).  The ALJ found that Dr. Robison's November 2008 opinion was entitled to "some, but not great weight" because the opinion did not adequately consider Plaintiff's subjective complaints. (TR 21).

In January 2009 and in February 2009, Plaintiff complained of symptoms of depression, and Dr. Robison noted a diagnostic impression of depressive disorder not elsewhere classified. (TR 603-604, 606-607).  In February 2009, Plaintiff was diagnosed with depressive disorder not otherwise specified at his treating mental health clinic. (TR 578).  In June 2009, Plaintiff was evaluated at his treating mental health clinic following a suicide attempt, and the examiner noted a diagnostic impression of depressive disorder not otherwise specified. (TR 664).  The consultative psychological examiner, Dr. Danaher, noted a diagnostic impression of depression of moderate severity and possible personality disorder not otherwise specified with borderline features. (TR 544).  Because no medical evidence in the record after Plaintiff alleged he became disabled in October 2008 reflects a diagnosis of or treatment for an anxiety-related impairment, the ALJ did not err in failing to find that Plaintiff had a separate mental impairment due to anxiety disorder.

In this regard, Plaintiff's subjective statements alone are not sufficient to support a finding of a severe medical impairment.  The ALJ's decision reflects consideration of Plaintiff's testimony concerning his mental impairments and symptoms, and the ALJ provided reasons that are well supported by the record for his findings that Plaintiff's mental impairments caused functional limitations, as set forth in the RFC finding, but did not

preclude Plaintiff from performing all work activity.   Plaintiff's references in his Opening Brief (TR 13) to his own subjective statements, to an isolated record, without benefit of page reference, of treatment of Plaintiff for "right flank pain in 2009," to a CT scan result showing the presence of kidney stones, and to Plaintiff's subjective and unsupported conclusion that his mental impairments "worsen[ed]" do not detract from the ALJ's credibility finding. Plaintiff is simply asking the Court to reweigh the medical and nonmedical evidence, and this the Court cannot do under the governing law and regulations.   Because substantial evidence in the record supports the Commissioner's findings and conclusion with respect to Plaintiff's applications and because no error occurred in the ALJ's evaluation of the evidence, the Commissioner's decision to deny Plaintiff's applications should be affirmed.

<u>RECOMMENDATION</u>

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before      September 17th , 2012, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72.   The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. <u>Moore v. United States</u>, 950 F.2d 656 (10th Cir. 1991); <u>cf.</u> <u>Marshall v. Chater</u>, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this _____29th_____ day of _____August_____, 2012.


GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE